IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANIJET CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 3:06-CV-1258-B |
| vs. | § | ECF |
| | § | |
| LEXOR INTERNATIONAL, INC., et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM ORDER

This is a patent infringement and breach of contract case that involves a pipeless jet for whirlpool tubs, pedicure spas, and other hydrotherapy appliances. The patents in suit, U.S. Patent Nos. 4,853,987 (the '987 patent), 5,414,878 (the '878 patent), and 5,587,023 (the '023 patent) are all owned by Plaintiff Sanijet Corporation.[1] Plaintiff filed this patent infringement action on July 14, 2006. The Court's current task is to construe some of the terms used in four of the claims in two of the patents in suit. While the parties have agreed to a construction of eighteen claim terms, the construction of four other terms remains in dispute. To that end, the parties briefed the issues and the Court held a *Markman*[2] hearing on January 9, 2008.

### I. CLAIM CONSTRUCTION PRINCIPLES

"It is a bedrock principle of patent law that the claims of a patent define the invention to

---

[1] All three patents in suit are contained in the parties' joint appendix. The '987 patent appears at APP 00001-11; the '878 patent appears at APP 00099-107; and the '023 patent appears at APP 00155-63. For the sake of simplicity, the Court will cite to the patents themselves rather than to the appendix.

[2] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

1

which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Claim construction is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims. *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000). The claim analysis begins with the language of the claim itself. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (5th Cir.1996). Absent an express intent to impart a novel meaning, terms in a claim are to be given their ordinary and accustomed meaning. *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004); *Id.* The ordinary meaning of the claim term is the meaning that term would have when viewed by a person of ordinary skill in the art of the invention as of the effective filing date of the patent. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

If the meaning of claim language is not readily apparent, the court looks to the sources available to the public that show what a person of ordinary skill in the art would have understood the claim to mean. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Those sources include the words of the claims, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. *Id.* Often the court examines the difference among claims to determine the meaning of particular terms used in any given claim. *Id.* (citations omitted).

Although the court places great attention on the claims themselves, the claims do not exist in a vacuum. "Claims must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). "The specification contains a written description of the invention which must be clear and complete enough to enable those of

ordinary skill in the art to make and use it." *Vitronics*, 90 F.3d at 1582. The specification is always highly relevant, has been described as "the single best guide to the meaning of a disputed term," and is typically dispositive. *See id.* "The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). However, the court must be cautious not to import limitations from the specification in determining the meaning of terms used in the claims. *Comark Comms. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998).

Although less significant than intrinsic evidence, extrinsic evidence may be considered when there is some ambiguity remaining after examination of the claims, specification, and prosecution history. *Phillips*, 415 F.3d at 1317-18; *Vitronics*, 90 F.3d at 1583-84. Conclusory assertions by experts as to the meaning of a claim term are not helpful to the court and expert testimony that is clearly at odds with the intrinsic record will be discounted. *Id.* "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). With this legal framework in mind, the Court turns to the claim construction.

## II. CONSTRUCTION OF DISPUTED TERMS

The four claim terms that the parties have asked the Court to construe all use the word "means" as part of the limitation. When a claim term uses the word "means," it gives rise to a rebuttable presumption that 35 U.S.C. § 112, ¶ 6 applies. *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999). Paragraph 6 of section 112 of the patent laws provides that:

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. The scope of a means-plus-function element is thus limited to those structures disclosed in the specification and their equivalents. *Cross Medical Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1303 (Fed. Cir. 2005).

The rebuttable presumption of the applicability of section 112, paragraph 6, is overcome only when the claim either recites no function related to the "means" or provides sufficient structure for performing any function that is recited. *Rodime,* 174 F.3d at 1302. "Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure." *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008). A proper recitation of specific structure need not include "every last detail of structure disclosed in the specification for performing the claimed [] function." *Rodime*, 174 F.3d at 1304. Further, sufficient structure may be disclosed when a "term, as the name for structure, has a reasonably well understood meaning in the art." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000) (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

"Once the court has concluded the claim limitation is a means-plus-function limitation, the court must identify the function of the limitation." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003) (*citing Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)). The Court then "ascertains the corresponding structure in the written description that

is necessary to perform that function." *Id.*; *accord Omega Eng'g. Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003) ("[T]he structure must be necessary to perform the claimed function."). "Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir.1997).

**B.     "Means for Sealing"**

The term " means for sealing" is used as part of an element within Claim 1 of the '987 Patent that reads: "said assembly having a *means for sealing* the assembly in the hole in said hot tub, spa, bathtub, whirlpool, or pool." ('987 Patent at Col. 7: ll. 19-21) (emphasis added).

The parties agree that this term is subject to the confines of 35 U.S.C. §112, ¶6 as a means-plus-function limitation. The Court agrees and finds that, based on the use of the word "means," the element falls within the rebuttable presumption that section 112 applies. The Court also finds that the presumption has not been rebutted, as there is no structure recited in the claim language that provides the referenced "means for sealing."

Thus, the Court turns to the identification of the claimed function at issue. *Med. Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The Court finds that the function disclosed by the disputed term "means for sealing" is "sealing the assembly in the hole in said hot tub, spa, bathtub, whirlpool, or pool." ('987 Patent at Col. 7: ll. 19-21).

Next, the court must examine the specification to ascertain the structure corresponding to that function. *Id.* Recited structure qualifies as corresponding structure when "the specification or prosecution history clearly links or associates that structure to the function recited in the claim."

5

*Id.* (quoting *B. Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

The specification only uses the word "seal" once, stating:

> As seen in FIG. 3 the hydrotherapy unit 26 includes a housing or casing 62 which in this case includes a cylindrical side wall 63, an end wall 64 and a circular peripherally extending radially projecting and vertically disposed mounting flange 66 which is secured to the tub wall 52 within a mounting hole 52*a* by means of circumferentially spaced mounting screws 68. A rubber gasket (not shown) can be provided between flange 66 and the wall 52 of the tub to assure a waterproof seal.

(Col. 3: l. 63–Col. 4: l. 4).

Plaintiff argues that only the gasket should be considered the structure for the "means for sealing" set forth in claim 1. (Pl.'s Br. at 12). Defendant argues that the sealing structure is a mounting flange and mounting screws and that the gasket may be included as part of that structure but is not necessary. (Def.'s Resp. at 7-8).

The Court finds that the gasket is not a necessary part of the structure performing the function of sealing the assembly in the hole. The specification clearly indicates that the gasket is an additional structure that might be added between the mounting flange (with its screws) and the wall of the tub "to assure a waterproof seal." The use of the modifier "waterproof" implies that a seal has already been created by the mounting of the assembly using the mounting flange and screws against the wall of the tub. Indeed, at the claim construction hearing, Plaintiff admitted that "the metal on metal connection between the flange and the wall and the screws … may create some degree of sealing," arguing only that such seal did not entirely prevent the entry of water into the assembly. (Tr. at 12). The Court views Plaintiff's argument as an invitation to read into the claim a requirement that the "sealing" be "waterproof sealing." The Court finds no basis to accept that

6

invitation and to so limit the claim. The patentee recognized that various degrees of sealing could be created by mounting the mounting flange and screws against the wall and merely provided an alternative option to improve that initial seal: "A rubber gasket (not shown) can be provided between flange 66 and the wall 52 of the tub to assure a waterproof seal." (Col. 4: ll. 2-4). Accordingly, the Court construes "means for sealing" to mean "a mounting flange and screws, with or without an intervening rubber gasket, or the equivalent."

**C.     "Means Directing the Flow of Water"**

The term " means directing the flow of water " is used in Claim 2 of the '987 Patent, which reads:

> The apparatus of claim 1 wherein said pump comprises a centrifugal pump having a mouth at the center thereof, a pump impeller and an outlet at the periphery thereof, a throat adjacent to the mouth of the pump for directing the flow of water into the mouth of the pump impeller and *means directing the flow of water* from the outlet of the pump impeller into said nozzle.

(Col. 7: ll. 37-44 (emphasis added)).

The parties agree that the term "means directing the flow of water" is subject to the confines of 35 U.S.C. §112, ¶6 as a means-plus-function element. The Court agrees and finds that, based on the use of the word "means," the term falls within the rebuttable presumption that section 112 applies. The Court also finds that the presumption has not been rebutted, as there is no structure recited in the claim language that provides the referenced "means [for] directing."

Thus, the Court turns to the identification of the claimed function at issue. *Med. Instrumentation*, 344 F.3d at 1210. The Court finds that the function disclosed by the disputed element is "directing the flow of water from the outlet of the pump impeller into said nozzle." (Col.

7

7:ll.42-43). Next, the court must examine the specification to ascertain the structure corresponding to that function. *Id.* Recited structure qualifies as corresponding structure when "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

Plaintiff proposes that the structure corresponding to the aforementioned function is "a channel or the equivalent." Defendant contends that the corresponding structure is a "pump housing having a spherical socket 94 for receiving an exterior ball surface 92 held in place with a threaded retaining ring for holding the nozzle 90." (Pl.'s Br. at 13; Defs.' Resp. at 10).

Along with the drawings, there are two sections of the specification that discuss the flow of water from the outlet of the pump impeller into the nozzle. First, the specification provides that:

> Rigidly connected to the end of the shaft 78 by means of a bolt 80 is a centrifugal pump impeller 82 having a mouth or inlet 84 for drawing water and for expelling it at the periphery through an outlet 86. *From the impeller outlet 86 the water travels centrally through a pump housing 88 to a hydrotherapy outlet nozzle 90.*
>
> The nozzle 90 is mounted centrally within the mouth 70 of the hydrotherapy assembly 26 and includes an exterior spherical or ball surface 92 allowing the nozzle to be articulated in any direction within a spherical socket 94. The jet nozzle 90 preferably includes a tapered throat 96 having a reduced diameter or venturi portion located approximately at the mouth 98 of an air supply duct 100 that passes out of the impeller housing and communicates with the air supply tube 34 through a hose fitting 102. The term "nozzle" herein is used broadly to refer to a duct having an opening for expelling water into the tub or other vessel. The hydrotherapy jet nozzle 90 is held in place within the socket 94 by means of a threaded retaining ring 104, which is screw threaded into the pump housing 88 adjacent to socket 94 to retain the ball 92 in place.

(Col. 4: ll. 26-47 (emphasis added)). Within the quoted paragraphs from the specification, the only

structure with a clear link to the direction of flow function recited in claim 2 is the pump housing—"From the impeller outlet 86 the water travels centrally through a pump housing 88 to a hydrotherapy outlet nozzle 90." (Col. 4: ll. 29-31).

Second, the specification also mentions the flow of water from the impeller to the nozzle at Column 5, lines 16-19:

> The impeller 82 forced water centrifugally outward due to the rotation imparted to it by the electric motor. The water then flows centrally to the nozzle 90.

The flow of water is also described in Figure 3 of the '987 patent. Figure 3 depicts, with a trail of arrows, the flow of water out of the outlet of the pump impeller through an area within the pump housing directly to the nozzle. In Figure 3, the flow of water appears to be directed by the walls of the pump housing 88 and the periphery of the pump impeller 82.

Defendant argues that the structure must include the spherical socket 94, exterior ball surface 92, threaded retaining ring 104, and the nozzle 90, because the nozzle must be secured in place in order for the assembly to direct water flow into the nozzle. (Tr. at 32). Although the specification describes additional structure for the placement and retainment in place of the nozzle, none of this additional structure is linked to or discussed in association with the function of directing the flow of water. (Col. 4: ll. 33-47). If anything, the specification suggests that the way the nozzle is mounted, utilizing the additional structure set forth above, is important to the way in which it guides the flow of water once it has already reached the nozzle—not from the outlet of the pump impeller into the nozzle. *See generally id*.

Moreover, "[w]hen multiple embodiments in the specification correspond to the claimed

9

function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments." *Micro Chem.*, 194 F.3d at 1258.  Although the specification does describe the preferred embodiment as Defendant argues, Defendant fails to recognize that the specification also provides for alternative embodiments of the nozzle structure in stating that "The term 'nozzle' herein is used broadly to refer to a duct having an opening for expelling water into the tub or other vessel." (Col. 4:ll. 42-44).

Interestingly, Defendant argued during the claim construction hearing that "If the structure had been different, and if this had just been a housing with a solid nozzle coming out, then that portion of the housing wall would be sufficient to direct the flow of water into the nozzle." (Tr. at 32). The Court reads the specification's broad definition of the term "nozzle" as effectively providing what Defendant recognized in argument would be a different structure associated with the nozzle.

In addition to finding that the structural elements related to the nozzle are not necessary to perform the claimed function of "directing the flow of water from the outlet of the pump impeller into said nozzle," the Court finds that including such elements would be incorrect as a matter of law, because that construction would read alternative embodiments out of the claim.  The fact that the nozzle could simply be a duct implies that the type of connective structure needed when the nozzle is articulated would likely be unnecessary and would certainly be different than the structures spherical socket 94, exterior ball surface 92, threaded retaining ring 104 that Defendant argues should necessarily be included as part of the "means directing the flow of water...."  For all of these reasons, the Court construes "means directing the flow of water from the outlet of the pump impeller into said nozzle" to mean "a channel formed by the pump housing 88 and the periphery of the pump

impeller 82, or the equivalent."

**D.    "Internal Means for Receiving and Pumping Water"**

The term "internal means for receiving and pumping water is used in claim 2 of the '878 patent, which claims "The whirlpool jet apparatus according to claim 1, wherein said jet assembly comprises an external housing and *internal means for receiving and pumping water*." (Col. 4: ll. 39-41 (emphasis added)).

The parties agree that this term is subject to the confines of 35 U.S.C. §112, ¶6 as a means-plus-function limitation. The Court agrees and finds that, based on the use of the word "means," the element falls within the rebuttable presumption that section 112 applies. The Court also finds that the presumption has not been rebutted, as there is no structure recited in the claim language that provides the referenced "internal means for receiving and pumping water."

Thus, the Court turns to the identification of the claimed function at issue. *Med. Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The Court finds that the function disclosed by the disputed term "internal means for receiving and pumping water" is "receiving and pumping water inside the jet assembly." (Col. 4:ll.40-41).

Next, the court must examine the specification to ascertain the structure corresponding to that function. *Id.* Recited structure qualifies as corresponding structure when "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (quoting *B. Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

The claimed function at issue is "receiving and pumping water inside the jet assembly." The specification outlines the jet assembly's process for receiving and pumping water:

11

> As the impeller 50 rotates, water is drawn from the bathtub 10 through the holes 66 in the escutcheon 60. The water [sic] drawn through the holes 66 into intake 68 of the stator 56, where the impeller 50 forces the water through the collet 52, through the jet nozzles 54, and back into the bathtub 10.

(Col. 3: ll. 48-53). These components are also depicted in Figures 4A and 4B of the '878 patent, along with the impeller shaft 48, which runs through the impeller 50 and connects to the slotted drive 42.

The parties have agreed that the structure includes at least the stator 56, the impeller 50, and the collet 52, but disagree as to whether the jet nozzles 54 should all be included in the construction of the means-plus-function limitation. (Parties' Joint Stip. as to Certain Claim Constr. ¶3). Plaintiff argues that the nozzle plays no part of the receiving or pumping function—it merely channels water that has already been pumped. (Tr. at 42-43). Defendant argues that the nozzle holds the impeller in place and without it, the pump would not function, such that the nozzle is therefore a necessary part of the structure. (Tr. at 46).

In considering the "receiving" aspect of the function of "receiving and pumping water inside the jet assembly," the Court finds that the specification denotes water being received into the interior of the stator 56 through its intake 68. No other structure appears in the specification that is an internal part of the jet assembly that receives the water. In considering the "pumping" aspect of the function of "receiving and pumping water within the jet assembly," the Court finds that the structure doing the pumping is the impeller 50, which is impaled on impeller shaft 48, and forces water out the side of the collet 52. The jet nozzles 54 appear to only be involved in directing the water upon its exit from the collet, not in receiving the water or in pumping the water. *See also* the

description of the nozzle in claim 3 of the '878 Patent claiming the nozzle as an apparatus "for directing an axial discharge of water…." Because the nozzle is unnecessary to the function of receiving and pumping water inside the jet assembly, the Court construes "internal means for receiving and pumping water" to mean "interior of the stator 56, intake of the stator 68, impeller 50, impeller shaft 48, and collet 52, and the equivalents thereof."

E.      **"Motive Power Means"**

    1.      **Applicability of § 112, ¶ 6**

The parties dispute the meaning of the term "motive power means" as that term is used in one element in Claim 10 of the '987 patent, which provides:

> a water pump means within said assembly and communicating between said inlet and said jet nozzle outlet and *motive power means* connected to the pump to energize the pump for recirculating water by drawing water into the assembly through the inlet and expelling a jet of water into the hot tub, spa, bathtub, whirlpool or pool through the hydrotherapy jet nozzle outlet with substantially no recirculation of said water outside of said hydrotherapy jet and pump assembly.

('987 Patent at Col. 8: ll. 44-53 (emphasis added)).

The parties disagree over whether or not the claim term "motive power means" should be construed as a means-plus-function claim in accordance with 35 U.S.C. § 112, ¶ 6. The patentee's utilization of the word "means" triggers the rebuttable presumption that § 112, ¶ 6 applies to the construction of this claim term. The only applicable exception available in order to overcome the rebuttable presumption of the applicability of section 112, paragraph 6, is if the claim provides sufficient structure for performing the function recited.[3] *Rodime,* 174 F.3d at 1302. Sufficient

---

[3]The Court finds that the first exception to overcome the rebuttable presumption–lack of recitation of a function–does not apply, as the claim clearly recites that the motive power means is used

structure may be disclosed when a "term, as the name for structure, has a reasonably well understood meaning in the art." *Watts*, 232 F.3d at 880-81.

Plaintiff argues that the term "motive power" denotes sufficient structure to rebut the presumption that § 112, ¶ 6 applies whenever the term "means" is used. However, Defendant counters that the claim does not recite sufficient structure to accomplish the function of energizing the pump, because it does not include a connection between a motor and a pump. (Pl.'s Opening Br. at 8; Defs.' Resp. at 11). Essentially, Plaintiff argues that one of skill in the art would understand "motive power means" to be a motor and Defendant disagrees. Defendant provides no explanation, cites no authority, and provides no evidence to support its position that one skilled in the art would not associate any structure with the term "motive power means."

Plaintiff points to evidence that the term "motive power means" has a reasonably well understood meaning in the art. To that end, Plaintiff's expert, mechanical engineering professor Kristin Wood, declares that one skilled in the art would understand "motive power means" to reference a prime mover or drive motor.[4] (APP 00295). The meaning proffered by Plaintiff is consistent with the dictionary definition of "motive power"—"any power used to impart motion; any source of mechanical energy." Dictionary.com Unabridged (v 1.1) *at* http://dictionary.reference.com/browse/motive%20power.

Furthermore, the instant case is analogous to *Cole v. Kimberly Clark Corporation*, in which

---

"to energize the pump...." (Col. 8: l.46).

[4]Evidence from expert witnesses is permissible to address whether a claim limitation should be treated as a means-plus-function limitation. *See Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).

the court declared that "*perforation means extending from the leg band means to the waist band means through the outer impermeable layer means for tearing* the outer impermeable layer" was not a means-plus-function limitation. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 526-527 (Fed. Cir. 1996) (emphasis in original). The *Cole* court found that the claim language fell within an exception to § 112, ¶ 6 because "perforation means … for tearing" describes the structure supporting the tearing function—perforations. *Id.* at 531. Likewise, "motive power means … to energize the pump" describes the structure supporting the energizing function. Additionally, as in *Cole*, the '987 Patent describes not only the structure supporting the recited function, but also its location—"connected to the pump." *See id.* Thus, the Court finds that the '987 Patent's recitation of motive power means sufficiently detailed to rebut the presumption of the application of § 112, ¶ 6.

Further, it is important to note that the patentee used the term "means" in two distinct ways in the claims of the '987 Patent. In the first instance, the patentee uses the more classic means plus function language, claiming "a means for sealing the assembly" and "means [for] directing the flow of water. . . ." (Col. 7: ll. 19, 42-43). In contrast, the patentee repeatedly uses "means" elsewhere throughout the claims linked to specific structure within the disclosed invention—throat means, water pump means, motive power means, pump means, and air inlet means. This distinction also bolsters conclusion that motive power means is not a means-plus-function limitation. Having found § 112, ¶ 6 inapplicable to the "motive power means" disclosed by the '987 patent, the Court now proceeds to determine its ordinary and customary meaning using general principles of claim construction.

2. **Construction**

In examining the language of the claims of the '987 patent to ascertain the ordinary meaning of term "motive power means" to one of skill in the art, the Court note that claims 11 and 12, which are dependant on claim 10, suggest that the motive power means might be "a pump motor" or "an electric motor." (Col. 8: ll. 63 and 66). Further, the specification sheds greater light on the meaning of "motive power means." As explained by the *Vitronics* court, the specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The specification repeatedly describes the power source for the jet and pump assembly and explains how it fits into the larger invention. The specification first describes "a pump motor" (Col. 2, l. 21), goes onto to talk about "[t]he hydrotherapy units 26 includ[ing] drive motors" (Col. 3: ll. 14-15), and then elaborates that the hydrotherapy unit contains "a drive motor 72 such as a suitable electric motor to which current is supplied through the conductor." (Col. 4: ll. 14-16). Finally, the specification enumerates the various power sources that can be used to energize the pump: "Any kind of drive motor such as an air motor, hydraulic motor or even an internal combustion motor can be used if desired." (Col. 7: ll. 3-5). The Court is careful not to limit the claims based on these references in the specification, but also notes that the breadth of the claim construction must be supported by the specification. For these reasons, the Court construes "motive power means" to mean "a drive motor, or the equivalent."

### III. AGREED CONSTRUCTIONS

As aforementioned, the parties have agreed on the construction of eighteen claim terms. Accordingly, those terms shall be construed as follows:

> (1) "Hydrotherapy jet and water pump assembly" ('987 patent, claim 1) means "a device that produces and transfers water flow to promote well being, such as water

16

massage and circulation."

(2) "Unitized water pump, water inlet and hydrotherapy jet outlet nozzle" ('987 patent, claim 1) means "the water pump, water inlet and hydrotherapy jet outlet nozzle connected together without intervening pipes."

(3) "Jet outlet nozzle" ('987 patent, claim 1) means "an exit passage for regulating and directing the flow of fluid."

(4) "Inlet" ('987 patent, claim 1) means "an opening providing a means for entrance or intake."

(5) "Centrifugal pump" ('987 patent, claim 2) means "a pump that uses centrifugal force to move fluid."

(6) "Mouth" ('987 patent, claim 2) means "an opening leading out of or into a cavity."

(7) "Pump impeller" ('987 patent, claim 2) means "a rotor or rotor blade(s) for transmitting motion."

(8) "Throat" ('987 patent, claim 2) means "a narrow passage or part suggestive of the human throat."

(9) "Unitized hydrotherapy jet and pump assembly" ('987 patent, claim 10) means "a device without intervening pipes that produces and transfers fluid flow to promote well being, such as water massage and circulation."

(10) "Jet and pump assembly" ('987 patent, claim 10) (same element as 9 above) means "a device without intervening pipes that produces and transfers fluid flow to promote well being, such as water massage and circulation."

(11) "Hydrotherapy jet nozzle outlet" ('987 patent, claim 10) means "the exit or exit passage for a device for regulating and directing the flow of water."

(12) "Water pump means" ('987 patent, claim 10) is "a water pump."

(13) "Jet casing" ('878 patent, claim 1; '023 patent, claim 7) means "a housing or outer covering of a device that produces a fluid flow."

(14) "Jet assembly" ('878 patent, claim 1; '023 patent, claim 7) means "any fluid pumping apparatus that both receives and pumps fluid without external tubing."

17

(15) "Operably housed" ('878 patent, claim 1) means "the jet assembly, when in operation, is substantially within the casing."

(16) "Means for retaining" ('878 patent, claim 1) means "a fastener that is jet escutcheon 60 having teeth 70 and jet casing 22 having shoulders, whereby the teeth may be rotated to engage the shoulders."

(17) "Means on said casing for driving said assembly" ('878 patent, claim 1) means "a transmission that is slotted drive 42 connecting drive shaft 40 to impeller 50 of the jet assembly."

(18) "Without breaking a watertight seal" ('023 patent, claim 7) means "removing the jet assembly from the jet casing without causing water to penetrate the seal between the jet casing and the tub aperture."

## IV. CONCLUSION

For the reasons set forth above, the disputed claim terms are construed as follows:

(1) "Motive power means" ('987 Patent, claim 10) means "a drive motor, or the equivalent."

(2) "Means for sealing the assembly" ('987 Patent, claim 1) means "a mounting flange and screws, with or without an intervening rubber gasket, or the equivalent."

(3) "Means directing the flow of water" ('987 Patent, claim 2) means "a channel formed by the pump housing 88 and the periphery of the pump impeller 82, or the equivalent."

(4) "Internal means for receiving and pumping water" ('878 Patent, claim 1) means "interior of the stator 56, intake of the stator 68, impeller 50, impeller shaft 48, and collet 52, and the equivalents thereof."

Additionally, the Court construes the agreed terms in accordance with the constructions provided by the parties. All relief not expressly granted herein is otherwise DENIED.

SO ORDERED.

SIGNED April 14, 2008.

_____
**JANE J. BOYLE**

**UNITED STATES DISTRICT JUDGE**